610 So.2d 1349 (1992)
Samuel JACKSON, Jr., Appellant,
v.
COLUMBIA PICTURES and Fireman's Fund, Appellees.
No. 91-780.
District Court of Appeal of Florida, First District.
December 30, 1992.
*1350 Daniel J. Sullivan, Miami, and Laurence F. Leavy, North Miami Beach, for appellant.
Donald F. Harrington, Miami, and Edward W. Levine of Marlow, Connell, Valerius, Abrams, Lowe & Adler, Miami, for appellees.
KAHN, Judge.
Appellant Samuel Jackson, Jr. seeks review of an order entered by the Judge of Compensation Claims (JCC) finding (1) that he has not reached maximum medical improvement (MMI), (2) is not entitled to attendant care, and (3) that a particular opthalmological insufficiency is not causally related to his industrial accident. We reverse as to the first two points, and affirm as to the third.
On September 5, 1986, Mr. Jackson, then 22 years old, suffered brain damage as the result of a 20 foot fall during the course of his employment with the employer, Columbia Pictures. In support of his claim for permanent total disability benefits, Jackson was required to prove that he had reached MMI. MMI is the "date after which further recovery from, or lasting improvement to, an injury or disease can no longer reasonably be anticipated, based upon reasonable medical probability." § 440.02(7), Fla. Stat. (1985); Corral v. McCrory Corp., 228 So.2d 900 (Fla. 1969). The record contains fairly extensive medical testimony dealing with Jackson's condition.
Dr. Ludwig, a clinical psychologist, found Jackson to be depressed secondary to organic brain syndrome, and indicated that Jackson has reached MMI.
Dr. Johns, a neurosurgeon, who saw Jackson twice in 1987, diagnosed post concussion syndrome, but never made a determination as to MMI.
Dr. Kishner, a neurologist, diagnosed post traumatic vertigo with post concussion syndrome and determined that Jackson had reached MMI from a neurological standpoint.
Dr. Cava, a psychiatrist, found Jackson to have organic brain syndrome due to trauma with a resulting adjustment disorder. Dr. Cava stated that Jackson had achieved MMI from an organic standpoint.
Dr. Yates, a neurological surgeon, examined Jackson on April 19, 1989, finding organic residual brain damage, and determined that Jackson had reached MMI from a neurosurgical standpoint by mid-1988.
Dr. Miller, a psychiatrist, saw Jackson on April 24, 1989, for an independent medical examination requested by the employer. Miller diagnosed post traumatic stress disorder with depression and social withdrawal, and went on to state that Jackson was "at or near" MMI psychiatrically, and might benefit from palliative treatment.
On the question of MMI, the JCC found:
It was Dr. Miller's opinion that the employee might benefit from anti-anxiety and depression medication and psychiatric care and treatment perhaps once a week for a few months and then down to once a month. It was further his opinion that the employee may be near [MMI] but might benefit from supporting counseling and medication.
Dr. Miller's actual testimony, synopsized above, is somewhat different:
A. [By Dr. Miller]: He would, however, benefit from referral for psychiatric care and treatment, including supportive counseling.
It was my opinion that his mental condition was such that he was at or near his [MMI] from a psychiatric point of view. So that further treatment might be palliative in nature, he might benefit from antianxiety and depression medication, but it would be basically to bolster his condition and stabilize him a bit.
Q. This treatment would be more in an aid to instruct him on how to deal with his accident, the results of his accident?
A. Yes, sir.
*1351 Dr. Cava, having stated that Jackson had probably achieved MMI from an organic standpoint, went on to say that it would still be possible that Jackson might continue to make better psychological adjustment as he goes along in treatment.
Any further improvement, or, better stated, adjustment, mentioned by Dr. Miller or Dr. Cava, would be, we believe, attributable to palliative care, appropriate for the psychological deficiencies that have resulted from Jackson's brain damage. Palliative care mitigates the conditions or the effects of an injury. See Clements v. Morrow's Nut House, 598 So.2d 279 (Fla. 1st DCA 1992). Viewed fairly, the testimony of both Dr. Cava and Dr. Miller characterized future treatment as palliative, and not treatment from which claimant will continue to improve.
As this case indicates, and as would be reasonably apparent to anyone, the aftereffects of traumatic brain damage are quite different from, say, a broken arm or leg. Medical experts in this case felt that in addition to the direct effects of his brain injury, Mr. Jackson also continued to suffer from related psychological deficiencies. It would be unreasonable to withhold a finding of MMI simply because intensive psychological counseling over a period of years in the future might offer a claimant the hopes of better coping with his difficult situation. Accordingly, we have concluded that the JCC's refusal to assign a date of maximum medical improvement is not supported by competent substantial evidence, and remand this matter for hearing at which time the judge should determine a date of MMI, and consider on its merits Jackson's claim for wage loss or permanent total disability benefits.
On the attendant care issue, the JCC made the following findings:
18. The employee has also made a claim for attendant care under 440.13. The nature of this care was described by Dr. Cava as `remote surveillance, like from another room or the other end of the house.' In this regard, the undersigned accepts the opinion of Dr. Lloyd Miller that the employee is not in need of any attendant care. In addition, the undersigned finds that the `supervision' contemplated is not the type of medical supervision or attendant care contemplated by 440.13 F.S.A.
19. In making the finding contained in paragraph 17 [sic] above, the undersigned has also relied on his own observation of the employee and his live testimony before me. I found the employee to be straight-forward, alert, and based on my observation of his demeanor, should not require any high degree of supervision. In addition, the testimony of other witnesses and the employee's mother indicates that the employee lives at home with three family adults and each works a different shift. An adult is present 24 hours per day and any minimal supervision, if any is required, can be provided as one would expect from a family member.
In reviewing the sufficiency of these findings, we must look again at the testimony of both Dr. Cava and Dr. Miller. Dr. Cava stated:
He would probably should have some kind of surveillance, even if it's remote, like from another room or from the other end of the house.
But somebody should keep some kind of a tactful eye on him because, in his condition, in his mood, with his diminishment, there is a possibility that he might exercise poor judgment and do himself or other people damage, deliberately or just by plain bad judgment.
Dr. Cava's statements indicate that attendant care, whether characterized as "remote surveillance," or otherwise, is, in fact, medically necessary. Surveillance, or oversight, by the caretaker is an appropriate form for attendant care where the facts reasonably indicate medical necessity. Caron v. Systematic Air Serv., 576 So.2d 372 (Fla. 1st DCA 1991); Williams v. Amax Chem. Corp., 543 So.2d 277 (Fla. 1st DCA 1989); and Standard Blasting & Coating v. Hayman, 476 So.2d 1385 (Fla. 1st DCA 1985), rev. denied, 488 So.2d 68 (Fla. 1986). Dr. Cava believes that, in the absence of a responsible attendant, Mr. Jackson is at risk to injure himself or someone else. Accordingly, the attendant care *1352 in this case does not fall under the rule which denies such care for the mere provision of household duties by family members. See, e.g., Kwik King v. Bennett, 576 So.2d 1368 (Fla. 1st DCA 1991).
Dr. Miller's testimony, upon which the JCC also relied to deny attendant care, does not support affirmance. Dr. Miller testified as follows:
Q. When you said the patient was not dangerous to himself or others, your opinion, again, was not taking into account the assumption that he may have organic brain syndrome; correct?
A. No. But I could take it into account and still say the same thing. I don't see him as meeting the Baker Act[1]criteria for involuntary commitment.

Q. I understand that. That means that he is not a violent person and dangerous in terms of being inclined to go out and batter somebody or physically assault a person; correct?
A. Or himself.
Q. You are not saying that he has organic brain syndrome and he is forgetful and may leave a burner on in the house or walk out into the street wandering around one night and get struck by a bus, that that has anything to do with your opinion as to whether he is dangerous to himself or others?
A. That is correct. That would be the third prong of a matter of commitments or incompetence. That is not what I was addressing. What I was addressing to say was he qualified for outpatient care, not inpatient hospitalization. (e.s.)
Dr. Miller's testimony indicates that he was not informed of the meaning of attendant care in workers' compensation cases. The doctor focused mistakenly upon indications for "outpatient care," rather than upon the claimant's need for attendant or custodial care due to the nature of his injuries. Whether one requires inpatient or outpatient medical care is not dispositive of the attendant care issue under section 440.13(2)(d), Florida Statutes (1985). See Rodriguez v. Howard Industries, 588 So.2d 646, 650 (Fla. 1st DCA 1991). Because the medical evidence was presented by deposition, this court is not in an inferior position to that of the JCC in interpreting the testimony. H & A Frank's Construction, Inc. v. Mendoza, 582 So.2d 780, 781-782 (Fla. 1st DCA 1991). Since Dr. Miller's testimony is founded upon an incorrect premise, we cannot say that the JCC's decision to accept the testimony over that of Dr. Cava has "articulable support in the record." Id. at 782, n. 2. For this reason, Dr. Miller's opinion on attendant care does not constitute competent substantial evidence. Accordingly, we conclude that the JCC's findings as to attendant care are not supported by competent substantial evidence and remand for a determination of the number of hours of attendant care needed by Mr. Jackson from the date of his release from the hospital to the present and continuing so long as medically necessary.
Claimant had the burden of proof to demonstrate a causal relationship between his eye condition (convergence insufficiency) and his compensable accident. The medical testimony on this point is equivocal, and thus we do not disturb the JCC's findings on this matter.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.
MINER and ALLEN, JJ., concur.
NOTES
[1] §§ 394.451, et seq., Fla. Stat. (1991).